Good morning, Your Honors, and may it please the Court. I'm Robert G. Ryan for the Petitioners, Ms. Maria Ahn, and Mr. Ekliam, you're in the courtroom today. Your Honors, I would like to reserve three minutes for rebuttal. Okay. As we see it, the main issue here is whether the substantial evidence compels the conclusion that no reasonable adjudicator would have denied withholding a removal under the Immigration and Nationality Act or the Convention Against Torture. Also, we are requesting that the Court extend disfavored group analysis under COTAS, V.I.N.S., and SAIL v. Ashcroft to Petitioners separate withholding of removal applications under INA Section 241b3 and the Convention Against Torture. As Your Honors know, the SAIL Court, at least implicitly, if not expressly, left open the question of whether disfavored group analysis would apply to INA withholding of removal and the Convention Against Torture. That's SAIL at 930 footnote 10. We believe the overarching consideration here is simply that the law of asylum and the law of withholding of removal both provide protection for claims of persecution. In other words, the common denominator for both types of relief is persecution. And the Convention Against Torture, the Convention's protection against torture simply provides protection against a discrete type of persecution. So for purposes of disfavored group analysis, the Convention is not distinguishable from withholding of removal. As we stated in our opening brief at page 17, because the analytic framework for asylum, except for the Petitioner's burden of proof to show anticipated persecution, is the same for withholding of removal under the INA, and of course we cited INS v. Cardozo-Fonseca, the Petitioners simply maintain that the evidence that they have marshaled also meets the higher standard of showing a clear probability of persecution should they be forced to return to Indonesia. And of course we cited INS v. Stubbeck. Now, if we agree with you that the SAIL analysis, if I can say it that way, should be applied in withholding of removal cases, is the proper thing for us to do simply to remand for reconsideration in light of that standard? Yes, Judge Fletcher, that would be the proper course. And we have requested that in our brief. That's to say, if we decide that that analysis should apply, we should not be applying it ourself until it requires a remand. All right. If I understand you correctly, what we are requesting that this Court do is extend disfavored group analysis to withholding of removal, both under the INA and both under the CAT. Right. Right. What were the acts of persecution here? Well, Judge Noonan, with respect to Ms. Ong, she had to change her Chinese name because her parents did not want her to get into trouble using her Chinese name, so she had to change her Indonesian name. As she was growing up in Surabaya, which is in eastern... She was what? I didn't hear what you said the second... I'm sorry. As she was growing up in Surabaya, she was taunted by native Indonesian classmates called their names, pushed her, chased her. In 1986, there was sexual assault and battery. Because she was Chinese? They actually said during the incident, Your Honor, serves you right, Chinese. That's at record page 565. And what did she... She thought she couldn't go to the police? She was about 13 or 14 at the time. What did her parents do? There's no indication in the record as to that, Your Honor. I would have to assume they just... Well, until you get to that event, the acts are trivial. Well, the sexual assault, Your Honor, they grabbed and squeezed her breast and she reacted in shock, as the record shows at page 565. Well, you know, acts of persecution have to be pretty severe to be acts of persecution. Whatever your standard is, whatever group you're in... She has testified that she was, as I said, or stated in her declaration, she was shocked. She testified in court that she believed this was physical harm. She what? That she said that this is physical harm at the record page... Well, actually, having your breast squeezed is, but... Right. How serious? But also, it was also connected with her ethnicity. And so you put the two together. Being targeted and so forth, yeah, because she was Chinese. But is it an act of persecution? In my experience of these things, none of these things amount to much. Well, a cumulative effect, of course, of these things can rise... No, but as I said to the other counsel, a string of zeroes add up to zero. Well, we think that there's something here, certainly more than Lalonde. Changing your name, that's a zero. It goes to one's identity. It's extremely offensive, really. Nobody doubts their identity. Right. But it changes... What the Indonesian government was trying to do was to get the ethnic Chinese to assimilate, quote-unquote. And that's offensive. Well, that happens in the United States, too. But it's not forced upon them. And in effect, it was forced upon them in Indonesia in order to avoid trouble. And that goes to the whole issue of the 60 discriminatory laws in Indonesia against the Chinese. This is a country that practices state- Absolutely not at all. State-sanctioned discrimination. And Chinese, and particularly Christian Chinese, have a difficult time. They're envied. They're the successful merchants. But what you're going to show is acts of persecution. Yes, Your Honor. And we believe the cumulative effect of what happened to her amounts to past persecution. But even if, Your Honor, if Your Honors conclude that these acts don't amount to past persecution, of course, in the sale case, there was no finding of past persecution, either. So what we're trying to do, again, is extend the disabled group analysis to withholding. And also point out that- Pardon me, counsel. Yes. The second element is that the persecution, if it is persecution, be done by the government or by a group which the government was unwilling to control. What's the group? Obviously, it was not done by the government, right? Well, Native Indonesians in Indonesia. Not everybody in Indonesia works for the government. No. These are private actors. There's no government- So why are these private actors in an identifiable group which the government does not wish to control? What's the evidence on that? Your Honor, the evidence on that is that there are 60 discriminatory laws against the ethnic Chinese. There are 60 discriminatory laws against the ethnic Chinese in Indonesia. This gives- Are there discriminatory laws that they can fondle women? Well, as a matter of fact, the country condition materials indicate that the government doesn't take sexual harassment that seriously. If I may just have a moment to find that. In the 2003 Indonesia Country Report, a quote, sexual harassment is not a crime, but indecent behavior is illegal. The law only addresses physical abuse and requires two witnesses. So I think that sums up how seriously the Indonesian government views these cases. But that's not focused on the Chinese. That's anybody in Indonesia. Well, that's true, Your Honor. But the fact is that the only group that has discriminatory laws against it are the ethnic Chinese. We'd also point out real quickly, since my time is running low, that the regulatory framework for past persecution and also for pattern and practice is the same in asylum and withholding cases. And so there wouldn't be any complication at all, as the government asserts in its brief, if this Court applies disfavor group analysis to withholding cases any more than there is with asylum cases. Why don't we hear from the government? You've got about a minute, and we'll hear from you in response. Thank you, Judge. Thank you. Once again, Charles Kanner on behalf of the Attorney General. Your Honors, I think I would rest on our briefs as to past persecution and the actual likelihood, if Petitioners have to make an individualized showing, of eligibility for withholding. I think those are pretty thoroughly addressed. Of course, I'll answer any questions you might have. I'd like to focus on the applicability of the SAIL analysis to withholding, and I think there are four reasons not to extend it, which I think would be an extension, to withholding of removal. The first reason is that it's simply not at all compelled by this Court's precedent. COTAS is over 13 years old. Does that make it better or worse? Well, in terms of applying it to withholding, it makes it worse because COTAS and SAIL are not the only disfavored group cases where that analysis has been employed. There are, but in all those cases where it has been employed, the Court has never seen fit to apply the disfavored group analysis to withholding of removal. Was that the case in Lolong v. Gonzalez also? In Lolong, I believe the Court didn't address withholding because it wasn't raised on appeal. I think that it's the same as in SAIL, which is another point. I think that SAIL doesn't actually implicitly leave open that disfavored group analysis applies to withholding. The footnote in footnote 10 simply says we don't address it because it's not been raised. So this Court's precedent simply doesn't apply. I point to Hoxa, if that's the correct pronunciation, in our brief, where the alien could not establish past persecution. The Court found that under disfavored group analysis, he would qualify for withholding. There would be a well-founded fear of future persecution. But then when the Court addressed withholding of removal, the Court simply said there's not enough here to show that it's more likely than not. It's stuck closer to the language of the regulations. Second, to get to the second reason is, analytically, I recognize that COTAS and SAIL, in some sense, are making, could arguably be said to be making a common sense, recognizing formally a common sense interpretation of asylum, insofar as asylum, as with withholding, requires some sort of group identity, religion, nationality, what have you. Except that I think there's a difference because of the burden of proof. There is a lot of room in between saying I have a well-founded fear of future persecution and a pattern in practice of persecution for purposes of asylum. In withholding, I don't think there's quite as much room for that, to get in, to say, it's more likely than not that I will be persecuted. Yet, if I were able to, I can't show that. But if I show I'm a member of a group which is severely persecuted, so that there's severe persecution, it's a disfavored group, then I don't have to show quite as much to get over the more likely than not hump. I think it's not necessarily impossible, but I think it complicates matters significantly, especially under the language of the regulations. The pattern of practice, for example, regulation says, there's a pattern of practice of persecution such that it would be more likely than not. So there's, I think that analytically, it is problematic. And as I addressed in the brief, I think Hoxha provides an example. It's hard to see why you would need to extend the disfavored group analysis to withholding of removal. The third reason is to extend the disfavored group analysis would create a circuit split. As I noted in the citation- Worse than the one we have already? Here, yes, Your Honor, because it would deepen the chasm between this circuit's asylum and withholding jurisprudence and that of the other circuits. The first circuit in Coe, which I alerted the Court of, the site specifically, is 505 F3rd 50. That's the first circuit. They specifically rejected the application of the disfavored group analysis to withholding of removal. Why? Why? Because, in part, because they recognized that, which has been the government's position for some time and was the government's position on Bonk and Lo Long, that the disfavored group analysis, given that it is the Attorney General's responsibility to promulgate regulations under the INA, that the disfavored group analysis goes beyond those regulations. The regulations say either you show that you have a well-founded fear or you show that there's a pattern of practice. With withholding, either you show it's more likely than not that you, the alien, will be persecuted or there's a pattern of practice. And the Court in the first circuit decided there's a subtle, sort of a subtle difference in the disfavored group analysis. That is, there's this ability to sort of simply show harm to others that allows you to meet the threshold. And it's not to say that harm to others is irrelevant, that it's not useful to consider, you know, to give context to one's asylum or withholding application. It's simply that it's not itself, it doesn't provide a separate means by which you can show, well, individually, I wouldn't necessarily, I'm not more likely than not to be harmed, but given that I'm in this group, you know, then I get myself over the hurdle. The fourth reason has to do with an important difference between asylum and withholding or removal, and that is the mandatory nature of withholding or removal. To extend the disfavored group analysis would, I think, be an unnecessary, unwarranted intrusion into the executive's authority to administer the immigration laws. There's where, as I said before, it is the Attorney General and now the Secretary of Homeland Security who have been charged with Congress with administering and enforcing the immigration laws. The question, then, for the court in a petition for review is either has the Attorney General acted in compliance with his own regulations or are those regulations themselves somehow problematic under the statute? Now, there's no indication and there's no argument that there's a problem with the regulations. Well, there is and there isn't. The same problem with the regulation exists with respect to withholding or removal as exists with respect to asylum. That is to say, the Kotas case says, you know, they deal with it specifically by regulation for purposes of pattern and practice. For the, I'll call it intermediate. I think I'm making that word up and imposing it upon Kotas. For the intermediate case where you have a disfavored group that's being badly treated in that society, they don't have a specific regulation, but as a sort of an analytic device, or maybe I can use a fancy word, an heuristic device, we think it's relevant if there really is a disfavored group in the society that increases the likelihood of somebody who belongs to that group will be persecuted. Well, fair enough, but I'm not sure that it's inconsistent with the regulations. The Kotas case's opinion is very clear. We're just kind of filling in some gaps. We do that a lot in immigration law. For example, we've got a lot of sort of rules of thumb, which I think this is no more than a rule of thumb, with respect to credibility findings. We say, well, you know, if it doesn't go to the heart of it, if it's just some trivial matter, we won't do it. And I don't think we're stepping out of line to do that. You can argue the wisdom of it, but I don't think it's inappropriate for us to have these kind of rules of thumb or sort of rules for our own guidance. They're not hard and fast. They're not per se. They're not. Well, with respect, Your Honor, in this Court, are there, you know, just in the nature of doing these case-by-case adjudications, is there going to be some gap-filling? Perhaps. But other courts have determined that, and the government has consistently contended that the disfavor group analysis is a little more than that. It's going beyond the regulations. And there, the Court, that is problematic, that's problematic specifically under INS v. Aguirre-Aguirre. So, and it's all the more problematic. It's one thing to have the disfavor group analysis operate in asylum where there's still the question of, well, in the Attorney General's discretion, does this alien merit asylum? And withholding, however, if the Court is going beyond that, which other courts have said that it would be, if the Court would extend that analysis, it's tying the Attorney General's hands and saying, you, Attorney General, must not remove this alien. So I think it's ‑‑ Well, of course, withholding is. And the only issue is if it's more likely than not, then boom, that happens. And so this is a device for trying to figure out is it more likely than not standard and satisfied. Right. But I think in the abundance of caution and respecting the Attorney General's authority to administer the immigration laws, where other circuits, the First, the Third, the Seventh, and I believe in an unpublished decision in the Second, have rejected the disfavor group analysis entirely, and the First and Seventh in published decisions have specifically rejected its application and withholding. I think out of an abundance of caution, we're not compelled by this Court's own precedent. There's no reason to extend it further. Thank you. Fair enough. Thank you very much for your argument. Response? Yes, Your Honors. With respect to the HOCSA case, at best it's unclear whether the HOCSA Court ever considered applying with a disfavor group analysis in the first instance to withholding of removal. We'd also note that the Court split is what it is. There was a case from the Fourth Circuit that was cited in the Coe case, Chen case, the site is 195, Fed Third, 198, 203, 204, and it discusses COTAS in the context of the 1999 case, in the context of pattern of practice evidence, and did not reject the disfavor group analysis. Your time has expired, but if you want to do a little wrap-up, I don't want to cut you off in mid-sentence. Yes, Your Honor. The mandatory discretionary distinction, again, the regulations recognize that as well, but the regulations on past persecution and pattern of practice with respect to asylum and withholding are virtually the same. So this would not unduly complicate anything to apply disfavor group analysis to withholding under the INA or under the CAT. Submitted. Thank you. Thank both sides for a nice argument. Thank you, Judge. The case of Ang v. McKeezy, now submitted. We're getting close. We've got two more. The second to the last one.
judges: Noonan, Fletcher, Bea